IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RALPH PERDOMO,

        Plaintiff,

vs.                                         No. CIV 04-0061 RB/WPL

CITY OF ALBUQUERQUE,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's ("the City" or "City's") Motion for Summary Judgment (Doc. 42), filed on February 14, 2005, and the City's Motion to Strike Exhibits 1-4 and 6-71 to Plaintiff's Response to Defendant's Motion for Summary Judgment, (Doc. 55), filed on March 29, 2005. Jurisdiction is founded upon 28 U.S.C. § 1331. Perdomo alleges discrimination and retaliation in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, *et seq.* ("ADA") and the New Mexico Human Rights Act, NMSA 1978, § 28-1-1, *et seq.* ("NMHRA"). The City has moved for summary judgment on all claims. Having considered the submissions of counsel, relevant law, and being otherwise fully advised, I find that the motions should be granted in part and denied in part.

## I.  Background.

    The City hired Perdomo to work as a truck driver in its Solid Waste Department in

August 1998.  Stella Candelaria, Associate Director of the Clean City Division of the Solid Waste Department, was responsible for assigning duties to Perdomo.  (Def. Ex. C.)  The essential functions of the truck driver position included operating vehicles and auxiliary equipment, loading and unloading cargo, performing preventive maintenance, and writing daily reports.  (Def. Ex. A7.)  Marginal functions included directing and coordinating laborers to accomplish assigned tasks, responding to citizen inquiries, and performing general maintenance.  (*Id*.)  Moderate to heavy lifting was required.  (Pl. Ex. 7.)  Truck drivers were typically assigned to supervise one or two laborers who helped the driver cut weeds, pick up litter, and load the truck.  (Def. Ex. A at 16-17.)

On August 25, 2000, Perdomo was run over by a tractor at work and sustained physical injuries to his left leg, back, hips, and ribs, and psychological injuries, including post-traumatic stress disorder.  (Pl. Ex. 20.)  Perdomo returned to work on January 27, 2001, and was assigned to light office work for four months.  (Pl. Ex. 20; Def. Ex. A at 68.)

On March 15, 2001, Dr. Carlos J. Esparza, M.D., noted that CT scans of Perdomo's pelvis and lumbar spine were essentially normal with no signs of fracture or organ damage. (Pl. Ex. 41.)  Perdomo reported pain in the right lumbar region, radiating numbness and tingling in his hip, tightening on the anterior portion of the right groin, and aching in his left ankle.  (*Id*.)  Medications, heat, and myotherapy provided pain relief and increased flexibility. (*Id*.)  Dr. Esparza stated that Perdomo was able to perform very heavy work[1] for

---

[1] Very heavy work is defined as lifting objects in excess of 100 pounds with frequent lifting and/or carrying of objects weighing 50 pounds or more.  (Pl. Ex. 40.)

eight hours a day, limited to one hour of continuous standing, sitting, or driving, forty-five minutes of repetitive lower leg activities, and only occasional bending, squatting, climbing, and twisting.  (*Id*.)  Dr. Esparza opined that Perdomo was able to use his hands for grasping, pushing, pulling, and fine manipulation.  (*Id*.)  He was able to engage in overhead reaching frequently, and occasional bending, squatting, climbing, and twisting.  (*Id*.)

On April 10, 2001, Dr. Esparza diagnosed Perdomo with low back, joint and leg pain and opined that Perdomo was able to perform very heavy work for eight hours a day, limited to four hours of continuous standing or walking, and three hours of continuous sitting or driving, and forty-five minutes of repetitive lower leg activities. (Pl. Ex. 32.)  On May 10, 2001, Dr. Esparza imposed the same restrictions. (Pl. Ex. 34.)  On May 31, 2001 and June 15, 2001, Dr. Esparza again stated that Perdomo was able to perform very heavy work with restrictions. (Pl. Exs. 36 and 37.)

In about May of 2001, Candelaria assigned Perdomo to cross-train as a graffiti removal technician.  (Def. Ex. A at 68.)  Perdomo testified that this position was less physically demanding than the truck driver position and allowed him time to rest.  (*Id*.)  While Perdomo was cross-trained, a laborer was assigned to help him.  (Def. Ex. A at 69-72.)

On January 18, 2002, Dr. Esparza released Perdomo to regular duty with no restrictions.  (Pl. Ex. 39.)  Candelaria returned Perdomo to the truck driver position.

On March 6, 2002, Laura Sugars, P.T., performed a functional capacity evaluation on Perdomo.  (Pl. Ex. 40.)  Ms. Sugars found a restricted range of motion in the left ankle,

pelvic mal-alignment, elevated pain level, and a decreased functional level.  (*Id*.)  Based on

her functional capacity assessment, Ms. Sugars determined that Perdomo was able to perform

light work in that he could lift twenty pounds occasionally and ten pounds frequently.  (*Id*.)

Ms. Sugars opined that Perdomo would benefit from physical therapy and pain management

strategies.  (*Id*.)

On March 27, 2002, Dr. Esparza determined that Perdomo had reached maximum

medical improvement.  (Def. Ex. A3; Pl. Ex. 42.)  Perdomo was able to perform medium

work,[2] limited by the ability to stand or walk for four to six hours, and sit or drive for five

to eight hours of an eight hour work day.  (Pl. Exs. 42, 43.)  His ability to use his feet for

repetitive motions was unrestricted, but Dr. Esparza imposed a mild restriction on working

around unprotected heights. (Pl. Ex. 42, 43.)

By January 23, 2003, Perdomo had significantly increased his physical activities  at

work.  (Pl. Ex. 44.)  On that date, Dr. Esparza observed increased back pain with spasms and

administered trigger point injections to reduce the symptoms.  (*Id*.)  Dr. Esparza advised

Perdomo to go home if his symptoms increased.  (*Id*.)  Perdomo was concerned because he

had exhausted his sick leave.  (*Id*.)  Perdomo informed Candelaria and other supervisors that

he was not able to perform his pre-injury work without risking re-injury.  (Pl. Ex. 70.)

On January 27, 2003, Perdomo advised Dr. Esparza that the City had placed him in

a different position at work, but had provided him with assistance for heavier duties.  (Pl. at

---

[2]Medium work is defined as lifting 50 pounds maximum with frequent lifting and/or
carrying of objects weighing up to 25 pounds.  (Pl. Ex. 43.)

45.)  On January 29, 2003, David Proffit, Perdomo's counsel, in a letter to Paul Civerolo, counsel for the City in Perdomo's workers compensation case, wrote that Perdomo had been assigned to a weed and litter crew performing community service and two laborers were assigned to help him.  (Pl. Ex. 46.)  Mr. Proffit noted that the community service assignment was more strenuous than graffiti removal, but that Perdomo was physically able to perform the work.  (*Id*.)  On February 2, 2003, Dr. Esparza wrote that the new work assignment had exacerbated Perdomo's symptoms.  (Pl. Ex. 47.)  A March 6, 2003 medical note indicated that Perdomo continued to experience an increased level of symptoms.  (Pl. Ex. 48.)

During this time-frame, Candelaria assigned Perdomo to drive a bus used to transport jail inmates around Albuquerque to perform clean-up duties.  (Def. Ex. C; Pl. Ex. 17.)  Perdomo testified at his deposition that the prisoner bus assignment did not require any unassisted lifting or loading, he was able to perform the prisoner bus driving duties, and he was satisfied with the prisoner bus assignment.  (Def. Ex. A at 109; 114; 140.)  Candelaria stated in her affidavit that the City occasionally assigned Perdomo other duties, but provided one or two helpers to assist him.  (Def. Ex. C.)  The helpers were not assigned as an accommodation, but were provided to improve efficiency of truck drivers.  (*Id*.)

On April 7, 2003, Dr. Esparza wrote that Perdomo's anxiety levels were increasing and that he had a significant amount of back, knee, and left ankle pain.  (Pl. Ex. 49.)  At that time, Perdomo was doing mostly bus driving, but the earlier assignments had aggravated his symptoms.  (*Id*.)  Dr. Esparza had a telephone conversation with Kathleen Padilla, Ph.D., Perdomo's treating psychologist, regarding Perdomo's anxiety and depression.  (*Id*.)  Dr.

Padilla felt that Perdomo's psychological condition had worsened and recommended that Perdomo have a psychiatric consultation.  (*Id.*)

On physical examination during the April 7, 2003 visit with Perdomo, Dr. Esparza observed distress, swelling of the left ankle and foot, a somewhat limited range of motion, foot pain, and ankle weakness.  (Pl. Ex. 49.)  Dr. Esparza diagnosed chronic pain with anxiety and depression and referred Perdomo for physical therapy and a psychiatric consultation.  (*Id.*)  On May 4, 2003, Dr. Esparza noted increased pain in the lower back with spasms.  (Pl. Ex. 50.)  Dr. Esparza excused Perdomo from work for two days, but then allowed him to return to medium duty.  (*Id.*)

In May 2003, the City advertised for applicants for a graffiti removal technician position.  (Def. Ex. A at 97.)  The graffiti removal technician position required a high school diploma or a GED, one year of painting experience.  (Def. Exs. A6 and F-1; Pl. Ex. 8.)  Experience in the principles and practices of painting, methods and techniques of mixing paints and enamel, and methods and techniques of surface preparation for painting were preferred.  (Def. Exs. A6 and F-1; Pl. Ex. 8.)

Perdomo applied for the graffiti removal technician position and submitted a letter, dated May 15, 2003, explaining that he was seeking the graffiti removal technician position because he did not feel that he was physically able to perform the duties of his truck driver position without risk of injury due to his disability resulting from the work injury of August 25, 2000.  (Def. Ex. A4; A9; Pl. Exs. 10-12.)

In his application, Perdomo stated that, from 1992 through 1996, he was in the

military and received training in building maintenance, including construction, painting, and finish work, and that he was cross-trained in graffiti removal from January 2002 to February 2003.[3]  (Def. Ex. A5; Pl. Ex. 9.)  The application also indicated that he was a high school graduate.  (*Id.*)  In the May 15, 2003 letter, Perdomo stated that he had performed the duties of a graffiti removal technician for approximately one year following his return to work after his injury.  (Pl. Ex. 12.)  The City rated Perdomo as not qualified for the graffiti removal technician.  (Pl. Ex. 14 ; Def. Ex. B at 71.)

On June 2, 2003, Dr. Esparza wrote that Perdomo was able to perform medium duty work for eight hours a day, limited to four to six hours of walking or standing, and five to eight hours of sitting or driving.  (*Id.*)

On July 8, 2003, Loraine Armijo was selected for the graffiti removal position instead of Perdomo.  (Def. Ex. A at 97-98; Pl. Exs. 13-16.)  At the time of her application in May 2003, Armijo had worked as a graffiti removal technician for the Solid Waste Department since February 2002.  (Pl. Ex. F-1.)  Candelaria testified that Perdomo was not offered the graffiti removal technician position because he was not on the list of qualified applicants. (Def. Ex. B at 72.)

On August 29, 2003, a police drug interdiction team raided the prisoner bus.  (Pl. Ex. 52.)  During the police operation, Perdomo was handcuffed behind his back for two to three hours.  (Pl. Exs. 23 and 52; Def. Ex. B at 78-79.)  As a result of the police incident,

---

[3] The stated time period conflicts with the complaint and Perdomo's deposition testimony that he was cross-trained in graffiti removal from approximately May 2001 until January 2002.

Candelaria ordered Perdomo to submit to a drug test, but she did not require a similarly situated City worker to do so. (*Id.*) The results were negative for illegal drug use. (Def. Ex. B at 81-82.)

Later that same day, J.L. Gillum, RN, CNP, of the City's Employee Health Center, assessed Perdomo with left shoulder, elbow, and wrist strain and right wrist strain as a result of the police incident. (Pl. Ex. 52.) Gillum took Perdomo off work, declined to give him a sling, and advised Perdomo to use his arms as much as possible. (*Id.*; Def. Ex. B at 82.) Gillum completed a written excuse for Perdomo to remain off work until September 2, 2003. (Pl. Ex. 53.)

On September 2, 2003, Gillum observed slight improvement in the ability to abduct the shoulder and tenderness on palpitation throughout the shoulder, arm, wrist, and thumb. (Pl. Ex. 54.) Gillum advised Perdomo to continue to ice the area and completed a written excuse for Perdomo to remain off work until September 10, 2003. (Pl. Ex. 55.)

On September 9, 2003, Perdomo had a limited range of motion in both wrists and upper back and continued pain in the left shoulder and upper back. (Pl. Ex. 56.) Gillum diagnosed bilateral trapezius and rhomboid strains, left thumb numbness, and "thoracolumbar" strain with right hip and left groin pain. (*Id.*) Gillum ordered Perdomo to stay off work, continue the medications prescribed by Dr. Esparza and Dr. Padilla, and referred Perdomo to physical therapy. (*Id.*) Gillum completed a written excuse for Perdomo to remain off work until September 16, 2003. (Pl. Ex. 57.)

On September 16, 2003, Gillum wrote that physical therapy had helped, but that

Perdomo was still in pain.  (Pl. Ex. 58.)  Gillum referred Perdomo for more physical therapy.  (*Id*.)  Gillum completed a written excuse for Perdomo to remain off work until September 24, 2003.  (Pl. Ex. 59.)

On September 24, 2003, Gillum noted that Perdomo was improving with  continued physical therapy.  (Pl. Ex. 60.)  Gillum wanted to keep Perdomo off work for the rest of the week, but Perdomo insisted that he wanted to return to the bus driving job on September 29, 2003.  (*Id*.)  Gillum completed a written excuse for Perdomo to remain off work until September 29, 2003.  (Pl. Ex. 61.)

On September 25, 2003, Dr. David Peters, M.D., a psychiatrist, wrote that Perdomo was unable to return to work for two weeks due to post traumatic stress reaction secondary to his work related injuries and the arrest.  (Pl. Ex. 62.)  On the same day, Dr. Padilla, the treating psychologist, wrote that Perdomo had severe symptoms of post traumatic stress disorder due to his work related injuries and that he should stay off work for another two weeks in order to recuperate. (Pl. Ex. 63.)

Perdomo was terminated on September 26, 2003.  (Pl. Ex. 70; Def. Ex. B at 82; Def. Ex. D.)  Candelaria testified in her deposition that Perdomo was terminated because he falsified paperwork regarding the August 2003 injury.  (Def. Ex. B at 83.)  Candelaria testified that, after Perdomo claimed that he was unable to work in any capacity, she referred him for investigation.  (*Id*.)

Clarence Lithgow, director of the solid waste department, testified in his deposition that Perdomo told Candelaria that Perdomo could hardly lift his arm.  (Def. Ex. E.)

9

However, an investigator videotaped Perdomo lifting the trunk of his car, reaching in, pulling objects out of the trunk, and handing the objects to his family.  (*Id*.)  In another video, Perdomo was holding a yard marker at a ball game.  (*Id*.)  Candelaria and Lithgow decided to terminate Perdomo because they believed that his statements were inconsistent with his actions in the videos.  (*Id*.)

Candelaria testified that she knew that Perdomo had suffered physical injuries and that he had limitations on the work he could perform, but she did not consider him disabled. (Def. Ex. C.)  Candelaria was aware that Perdomo had requested placement in the graffiti removal technician position because he believed that he could more easily perform the duties of that position.  (*Id*.)  After the police incident, Candelaria was aware that Perdomo claimed additional injuries, but she testified that she did not receive information about further limitations placed on his ability to perform employment duties.  (*Id*.)

Perdomo testified in his deposition that his physical impairments consisted of his pain and that they affected his gait, sexual activity with his wife, and his ability to run with his son.  (Def. Ex. A at 48.)  Specifically, ankle swelling caused him to walk with a limp, hip pain prevented him from walking for long periods of time, and hip and groin pain interfered with sexual activity.  (Def. Ex. A at 48-49.)  The problems did not prevent sex, but he had sex once a month rather than once or twice a day. (Def. Ex. A at 49-50.)  Although his back pain did not prevent him from engaging in activities, he was unable to "overdo it."  (Def. Ex. A at 49.)  Perdomo testified that his emotional problems affected his emotional state with his family and made him want to stay home.  (Def. Ex. A at 50-52.)

Perdomo was harassed by co-workers in 2003, who made derogatory comments about his physical condition.  (Pl. Ex. 70.)  Perdomo averred that he reported the incident to Candelaria and other supervisors and they failed to take remedial action.  (*Id.*)  Candelaria testified that she addressed Perdomo's complaint of co-worker harassment.  (Def. Ex. C.)

Perdomo filed a charge of discrimination on October 7, 2003, asserting disability discrimination and retaliation.  (Def. Ex. 9.) In a May 19, 2004 independent medical examination report, Dr. Barry Diskant, M.D., stated that Perdomo reached maximum medical improvement for all of his conditions on October 27, 2003.  (Pl. Ex. 23.)  Dr. Diskant opined that Perdomo was capable of returning to light work defined as lifting up to 20 pounds occasionally and 10 pounds frequently.  (*Id.*)

## II.  Motion to Strike.

The City moved to strike Perdomo's Exhibits 1-4 and 6-71 on the grounds that Perdomo did not mention Exhibits 11-16 and 65-69 in his response, Exhibits 1-4 and 6-69 were unsworn and uncertified, and Exhibits 70 and 71 were not based on personal knowledge and conflicted with Perdomo's deposition testimony.

Rule 56 describes the type of materials that may be considered when analyzing a motion for summary judgment.  *See* FED. R. CIV. P. 56.   A court must consider pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . .. FED. R. CIV. P. 56(c).  Affidavits submitted in support or in opposition to a summary judgment motion must be based on personal knowledge and set forth such facts as

11

would be admissible in evidence and show affirmatively that the affiant is competent to testify on the matters stated in the affidavit.  FED. R. CIV. P. 56 (e).

Perdomo did not object to the motion to strike Exhibits 65-69.  Accordingly, the motion will be granted as to these exhibits.  Exhibits 11-16 concern Perdomo's application for the graffiti removal technician position, Perdomo's medical treatment, and sick leave records for September 2003.  These exhibits clearly relate to the issues argued in Perdomo's response brief.

Perdomo initially submitted Exhibits 1-4 and 6-64 without authenticating affidavits.  However, Perdomo attached affidavits from himself and medical providers that are based on personal knowledge, authenticate the documents in question, and otherwise appear admissible.  Therefore, the motion to strike will be denied as to Exhibits 1-4 and 6-64.

The City objects to Exhibits 70 and 71, Perdomo's affidavits, because they are not based on personal knowledge and conflict with his deposition testimony.  The affidavits appear to be based on personal knowledge as required by Rule 56.  I do not believe that the personal knowledge objection is well-taken.  More troubling, however, are the conflicts between the affidavits and the deposition testimony.

The City points out that portions of Exhibits 70 and 71 may be read to conflict with Perdomo's deposition testimony.  Perdomo testified at his deposition that he was cross-trained in graffiti removal from approximately May 2001 until January 2002, he was assigned to drive the prisoner bus between January and May of 2003, the prisoner bus assignment did not require any unassisted lifting or loading, he was able to perform the

prisoner bus driving duties, and he was satisfied with the prisoner bus assignment.

Perdomo stated in Exhibits 70 and 71 that he was assigned to graffiti removal until December 2002, that the transport bus assignment (presumably the prisoner bus assignment) was heavy work, that he tried to inform Candelaria that he was not able to perform his pre-injury work, and that on many occasions after March 2003, the City directed him to perform truck driver duties that exceeded his medical restrictions.

The language in the affidavits is ambiguous. With the exception of the discrepancy in the dates for the graffiti removal assignment, the deposition and the affidavits are not mutually exclusive.  Any factual dispute is immaterial to the outcome of the motion for summary judgment.  The motion to strike Exhibits 70 and 71 will be denied.


## III.  Summary Judgment Standard.

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.'" *Muñoz v. St. Mary Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (quoting Rule 56(c)).  When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party.  *Id*.

The movant bears the initial burden of establishing that no genuine issue exists as to

any material fact.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)).  The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the non-moving party on an essential element of that party's claim.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate a genuine issue for trial on a material matter.  *See McGarry v. Pitkin Co.*, 175 F.3d 1193, 1201 (10th Cir. 1999).

If the moving party satisfies its initial burden, the party opposing the motion for summary judgment may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing there is a genuine issue for trial as to a dispositive matter for which it carries the burden of proof.  *See Muñoz,* 221 F.3d at 1164.  It is not sufficient "to simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  An issue of material fact is genuine if a reasonable jury could return a verdict for the party opposing the motion.  *See Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003).  The substantive law at issue determines which facts are material in a given case.  *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).

14

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

## IV.  Analysis.

### A. Disability discrimination claims.

Perdomo alleges disability employment discrimination under the ADA and the NMHRA.  Both the  NMHRA and the ADA prohibit employment discrimination against qualified individuals with disabilities.  *See* 42 U.S.C. § 12112 and NMSA 1978, § 28-1-7(A).[4]  Disability discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee [.]" 42 U.S.C. § 12112(b)(5)(A).  To establish a prima facie case of disability discrimination, an employee must show: (1) he is disabled within the meaning of the ADA; (2) he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) he was discriminated against because of his disability.  *Mason v. Avaya Communications, Inc.,* 357 F.3d 1114, 1118 (10th Cir. 2004); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1128 (10th Cir. 2003).

The ADA defines a disability as (A) a physical or mental impairment that

---

[4]The analytical framework used in ADA claims has been applied to claims brought under the NMHRA, and terms in both statutes have been used interchangeably.  *See Ocana v. American Furniture Co.*, 135 N.M. 539, 549, 91 P.3d 58, 68 (2004)  Thus, the analysis pertaining to Perdomo's ADA claims is applicable to his claims brought under the NMHRA.

substantially limits one or more of the major life activities of . . . an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. *See* 42 U.S.C. § 12102(2)(A-C). Perdomo argues that he qualifies as disabled under each definition.

In order to establish an actual impairment under § 12102(2)(A), Perdomo must (1) have a recognized impairment; (2) identify one or more appropriate major life activities; and (3) show that the impairment substantially limits one or more of those activities. *Doebele*, 342 F.3d at 1129. The first two elements are questions of law; the third is a question of fact that may be decided by the Court on summary judgment. *Id.*

Recognized impairments include physiological conditions affecting the neurological or musculoskeletal systems and emotional or mental illness. *See* 29 C.F.R. § 1630.2(h); *Poindexter v. Atchison, Topeka & Santa Fe Ry. Co.*, 168 F.3d 1228, 1232 (10th Cir. 1999). Perdomo has submitted evidence that he suffered from chronic pain, loss of motion and spasms in his back, right hip, and ankle, and post traumatic stress disorder. (Pl. Br. at 8; Pl. Ex. 20, at 7; Pl. Ex. 23 at 85; Def. Ex. D.) Such physiological and psychological problems may constitute disabilities under the ADA. *See Poindexter*, 168 F.3d at 1232.

The second inquiry is whether the impairments affect one or more major life activities. The EEOC regulations interpreting the ADA state that "major life activities" are those basic activities that the average person in the general population can perform with little or no difficulty. 29 C.F.R. § 1630.2(i). Examples of major life activities include activities such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, sitting, standing, lifting, and reaching. *Id.*; *see also Toyota*

*Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 195 (2002).  The "touchstone" for determining whether an activity qualifies as a major life activity is the activity's significance in daily life to the average person.  *See Bragdon v. Abbott*, 524 U.S. 624, 638 (1998).

Perdomo asserts that his impairments affect the major life activities of performing heavy work, engaging in physical activity, experiencing sensory function, traveling, engaging in sexual function, and sleeping.  (Pl. Br. at 9; Def. Ex. D.)  Sexual reproduction and sleeping have been recognized as major life activities.  *See Bragdon*, 524 U.S. at 638; *Pack v. Kmart Corp.*, 166 F.3d 1300, 1302 (10th Cir. 1999). If engaging in physical activity and experiencing sensory function are equated to performing manual tasks and hearing and seeing, they could qualify as a major life activities.  *See e.g. Lusk*, 238 F.3d at 1240.

Perdomo identifies performing heavy work as a major life activity. Although the EEOC regulations include working as a major life activity, 29 C.F.R. § 1630.2(i), the Supreme Court has been reluctant to hold that working qualifies as a major life activity.  *See Toyota Motor*, 534 U.S. at 200.   In spite of this reluctance, the Court has assumed that working is a major life activity.  *Sutton v. United Air Lines Inc.*, 527 U. S. 471, 492 (1999).

Perdomo has not cited to, and research has not revealed, a case that holds that performing *heavy* work qualifies as a major life activity.  Indeed, the Tenth Circuit has determined that a forty pound lifting restriction was not disabling within the meaning of the ADA. *See e.g. Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1240-41 (10th Cir. 2001). When the major life activity at issue is that of working, a plaintiff must show that he is unable to perform either a class of jobs or a broad range of jobs in various classes.  *See*

*Sutton.*, 527 U.S. at 491-92 (quoting 29 C.F.R. pt. 1630, App. § 1630.2(j)(3)(i)).

Perdomo has not cited to a case where traveling was held to be a major life activity. Indeed, the Second Circuit has determined that driving is not a major life activity. *Felix v. N.Y. City Transit Auth.*, 324 F.3d 102, 106 (2nd Cir. 2003). Common experience suggests that traveling is not generally of great significance in the daily life of the average person. However, it is not necessary to decide whether traveling qualifies as a major life activity because Perdomo has failed to establish that his impairments substantially limit his ability to perform any of the major life activities that he identified.

An impairment is substantially limiting if it prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. *Toyota Motor*, 534 U.S. at 198. The Supreme Court has defined "substantially limits" as "considerably" or "to a large degree." *Id.*, 534 U.S. at 196. The existence of a disability is evaluated on a case-by-case basis, such that a plaintiff must offer "evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial" as compared to the general population. *Toyota Motor*, 534 U.S. at 198; *Lusk*, 238 F.3d at 1240.

In order for a physical or mental impairment to be substantially limiting, the individual must be: (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general

18

population can perform that same major life activity.  *Lusk*, 238 F.3d at 1240; 29 C.F.R. § 1630.2(j)(1).  In essence, "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota Motor*, 534 U.S. at 198.

Perdomo relies on his medical diagnoses to show that he is disabled.  "It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." *Toyota Motor*, 534 U.S. at 198.  Standing alone, the fact that a person is diagnosed with a medical impairment does not demonstrate that the impairments substantially limit a major life activity.  For instance, the Tenth Circuit has determined that a truck driver who had open heart surgery and who was subsequently released to work with a forty pound lifting restriction was not disabled within the meaning of the ADA. *Lusk*, 238 F.3d at 1240-41.  Similar to the plaintiff in *Lusk*, Perdomo has not demonstrated that his impairments substantially limit a major life activity.

The record in this case establishes that Perdomo was diagnosed with medical impairments.  However, the record does not demonstrate that these impairments prevented or severely restricted Perdomo from doing activities that are of central importance to most people's daily lives.

With respect to the activity of working, Dr. Esparza opined that Perdomo was able to perform medium work with restrictions.  Dr. Diskant found that Perdomo could perform light work with similar restrictions.  The record establishes that Perdomo was able to perform several different work assignments.  Because Perdomo has introduced no evidence of an

inability to work in a broad class of jobs, he was not substantially disabled in the life activity of working.  *See Lusk*, 238 F.3d at 1240; *see also Brunko v. Mercy Hosp.*, 260 F.3d 939, 942 (8th Cir.2001) (holding that plaintiff, a nurse, was not substantially limited in life activity of working because she worked in several nursing jobs after being unable to work in nursing position that required heavy lifting).

The medical records do not reflect any limitations in sensory function, traveling, engaging in sexual function, or sleeping.  Perdomo testified in his deposition that his impairments caused him to limp, prevented him from walking for long periods of time, lessened the frequency of sex, prevented him from "overdoing it," affected his emotional state, and made him feel like staying home.  Perdomo did not describe substantial limitations on his daily activities.  Although the record indicates that Perdomo suffers from physical and mental impairments, it does not establish that his impairments significantly restricted his ability to perform major life activities.

Moreover, where an impairment is not so severe as to be substantially limiting on its face, a plaintiff is required to present comparative evidence that the limitations place his abilities significantly below those of the average person.  *Toyota Motor*, 534 U.S. at 198; *Lusk*, 238 F.3d at 1241; *Doyal v. Okla. Heart, Inc.*, 213 F.3d 492, 497 (10th Cir. 2000).  "[U]nless an ADA plaintiff can show that his impairment reduces his capabilities significantly below those of the average person, he is not deemed 'disabled' under the Act." *Lusk*, 238 F.3d at 1240.

Perdomo has submitted no evidence of how much the average person can lift or any

evidence suggesting that he experienced greater difficulty than anyone else in engaging in physical activities, experiencing sensory function, traveling, engaging in sexual function, or sleeping.  Without this evidence, a fact finder cannot make the comparison between Perdomo and the 'average person' as ADA regulations require. *Toyota Motor*, 534 U.S. at 198; *Lusk*, 238 F.3d at 1241; *Doyal v. Okla. Heart, Inc.*, 213 F.3d 492, 497 (10th Cir. 2000).

Although the Court must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, . . . that party must identify evidence which would require submission of the case to a jury." *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1402 (10th Cir. 1997).  Construed in the light most favorable to Perdomo, the record is insufficient to show that Perdomo suffers from an impairment that substantially limits a major life activity.  Thus, he has failed to demonstrate an actual impairment within the meaning of the ADA.

Perdomo argues that he qualifies as disabled because he has a record of an impairment.  *See* 42 U.S.C. § 12102(2)(B).  In order to establish a record of impairment, "a plaintiff must have a history of, or have been erroneously classified as having, an impairment that has substantially limited a major life activity." *Rakity v. Dillon Companies, Inc.*, 302 F.3d 1152, 1158 (10th Cir. 2002).  The intent of this provision is to ensure that people are not discriminated against because of a history of a disability.  *See* 29 C.F.R. § 1630.2(k).

Perdomo claims a record of such impairment because the City received medical records on a regular basis following the August 25, 2000 injury.  Because Perdomo has presented no evidence that he has a record of an impairment severe enough to substantially

limit a major life activity, Perdomo has failed to establish a record of a disability.

In the alternative, Perdomo argues that the City regarded him as disabled. *See* 42 U.S.C. § 12102(2)(C). Under this theory of disability, Perdomo must show that he has a physical or mental impairment that does not substantially limit a major life activity, but that the employer treated him as having a substantially limiting impairment. *McKenzie v. Dovala*, 242 F.3d 967, 970 (10th Cir. 2001). A person is regarded as disabled when "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489. In creating this category of disability, Congress recognized that "society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *Id.*

Perdomo states that the City regarded him as disabled because Candelaria understood that he suffered physical injuries and had limitations on the work he could perform and that he was medically restricted from returning to any work during the period from August 29, 2003 through September 29, 2003. Candelaria testified that she did not consider Perdomo disabled, but only that he had temporary injuries and required job assignments within his medical limitations. This testimony is supported by Perdomo's medical records.

The fact that a person has medical restrictions does not necessarily establish that person was regarded as disabled. *See Lusk*, 238 F.3d at 1241. A plaintiff must show that the employer believed the perceived impairment substantially limited him in at least one major

life activity. *Lanman v. Johnson County, Kansas*, 393 F.3d 1151, 1157 (10th Cir. 2004). Perdomo has presented no evidence that the City mistakenly believed that he had a physical impairment that substantially limited a major life activity, or (2) that the City mistakenly believed that an actual, non-limiting impairment substantially limited a major life activity. Viewing the evidence in the light most favorable to Perdomo, there is no issue of material fact that the City regarded Perdomo as disabled.

Perdomo did not plead a hostile work environment claim in his complaint. However, he mentioned harassment in his charge of discrimination, the pretrial order, and his brief. Hostile work environment claims based on disability are actionable in the Tenth Circuit. *Lanman*, 393 F.3d at 1155. Perdomo stated in his affidavit that co-workers made derogatory comments in reference to his physical condition. (Pl. Ex. 70.) The City objects to assertion of a hostile work environment claim because such a claim was not pleaded in the complaint and the City has not had an opportunity to present a defense pursuant to *Faragher v. City of Boca Raton*, 524 U.S. 775, 805 (1998).[5]

Isolated comments and rudeness are insufficient to comprise a hostile work environment as a matter of law. *Sandoval v. City of Boulder*, 388 F.3d 1312, 1327 (10th Cir. 2004). Construed in the light most favorable to Perdomo, the record is insufficient to

---

[5] When no tangible employment action is taken, the employer may defeat vicarious liability for harassment by establishing, as an affirmative defense, both that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm. *Faragher*, 524 U.S. at 807. Unlike *Faragher*, the instant case involves a tangible employment action.

establish a hostile work environment as a matter of law.  The City is entitled to summary judgment on the disability discrimination claims.

### B. Retaliation claims.

The ADA and the NMHRA prohibit retaliation for opposing an unlawful employment practice.  42 U.S.C. §12203(a);  NMSA 1978, § 28-1-7(I)(2); *Ocana*, 135 N.M. at 553, 91 P.3d at 72.  A plaintiff need not be disabled in order to recover for retaliation.  A plaintiff may show retaliation through indirect evidence using the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973).  A plaintiff has the initial burden of establishing a prima facie case of retaliation by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802-804.  If the plaintiff establishes a prima facie case, then the defendant must articulate some legitimate, non-retaliatory reason for the challenged personnel action.  *Id.*  The plaintiff then bears the ultimate burden of demonstrating that the defendant's stated reason is, in fact, a pretext for unlawful retaliation.  *Id.* at 804.

In order to establish a prima facie case of retaliation under the ADA, Perdomo must show that (1) he engaged in protected activity; (2) he was subjected to an adverse employment action subsequent to, or contemporaneous with, the protected activity; and (3) there was a causal connection between the protected activity and the adverse action.  *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001).

Perdomo submitted a letter requesting reassignment to the graffiti removal technician position as an accommodation for his alleged disability. The City concedes the letter constituted protected activity and that the termination constituted an adverse employment

action.  However, the City maintains that the non-selection of Perdomo for the graffiti removal technician position was not an adverse employment action and that there was no causal connection between the request for accommodation and the termination.

The Tenth Circuit liberally construes the term "adverse employment action" and takes a case-by-case approach, examining the "unique factors relevant to the situation at hand." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004).  Nevertheless, "a mere inconvenience or an alteration of job responsibilities" does not rise to the level of an adverse employment action.  *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998).  In order to qualify as adverse, the action must adversely affect the employee's status as an employee, *id*, 164 F.3d at 533, such as "firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Aquilino v. Univ. of Kansas*, 268 F.3d 930, 934 (10th Cir. 2001).

The threshold for an adverse employment action is not high.  *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir.1998).  For example, in *Connor v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997), negative evaluations were sufficient to constitute an adverse employment action.  *Id*. at 1395.  In *Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir. 1993), reassignment to a different office over plaintiff's objections was sufficient to establish an adverse employment action.  Perdomo testified that the graffiti removal job required less physical exertion than his other job assignments, allowed him time to rest, and presented a lower risk of re-injury.  These factors could have affected Perdomo's ability to keep his job with the City. Viewed in the light most favorable to Perdomo, the

City's decision not to select him for the position adversely affected Perdomo's status as an employee.  Therefore, the non-selection for the graffiti removal technician position qualifies as an adverse employment action.

The City argues that Perdomo has failed to establish a causal connection between the letter and the adverse employment actions.  A plaintiff may establish a causal connection by producing "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320 (10th Cir. 1999), *overruled on other grounds by National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  The City selected Armijo for the graffiti removal position on July 8, 2003, less than two months after the letter was submitted.  The close temporal proximity suffices to demonstrate a causal connection between the protected activity and the non-selection.

Perdomo was terminated over four months after submitting the letter.  The Tenth Circuit has held that a three month period, standing alone, is insufficient to establish causation.  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).   Where an adverse action (in this case the termination) was not closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation.  *Id*.  Evidence of heightened scrutiny or differential treatment may constitute such additional evidence indicating a causal connection between the protected activity and the adverse employment action.  *Lee v. New Mexico State Univ. Bd. of Regents*, 102 F. Supp. 2d 1265, 1276-77 (D. N.M. 2000) (citing *Marx v. Schnuck Markets, Inc.*, 76

F.3d 324, 329 (10th Cir. 1996)).

Perdomo has submitted sufficient indirect evidence to show a causal connection. Although his application indicated that he met the minimum qualifications for the job, Perdomo was not designated as qualified.  Candelaria ordered Perdomo to take a drug test after the police incident, but she did not require another City employee who was on the scene to take a test.  Candelaria targeted Perdomo for investigation and terminated him based on performance of activities that were not prohibited by Gillum.  Construed in the light most favorable to Perdomo, this evidence is sufficient to establish a causal connection between the protected action and the termination.  *See Annett v. Univ. of Kansas*, 371 F.3d 1233, 1240 (10th Cir. 2004).

Once Perdomo met his burden of demonstrating a prima facie case, the burden of production shifted to the City to demonstrate a legitimate, nondiscriminatory reason for the adverse employment action.  *McDonnell Douglas*, 411 U.S. at 802-804; *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003).  At step two, the defendant need only advance a facially nondiscriminatory reason for its action against the plaintiff.  *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1317 (10th Cir. 1992).  With respect to the non-selection, Candelaria testified that Perdomo was not selected because he was not on the qualified applicant's list. With respect to the termination, Candelaria and Lithgow testified that Perdomo was terminated for lying about his medical condition. The City has satisfied its burden of advancing facially nondiscriminatory reasons for the non-selection and the termination.

After the defendant satisfies its production burden, the plaintiff is required to proffer

27

evidence that the employer's reason was pretextual. *McDonnell Douglas*, 411 U.S. at 804.

"A plaintiff can show pretext by revealing weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action

such that a reasonable fact finder could rationally find them unworthy of credence." *Garrett*

*v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002).

Perdomo cross-trained as a graffiti removal technician for at least seven months and

had painting experience during his four years in the military.  Construed in the light most

favorable to Perdomo, the record indicates that Perdomo met the minimum qualifications for

the graffiti removal technician position.  However, the City apparently did not credit

Perdomo with his painting experience when analyzing his application because he was labeled

as unqualified for the position.

Pretext can be inferred where the facts show that the plaintiff was better qualified than

the successful applicant for the position and the criteria is entirely subjective.  *Jones*, 349

F.3d at 1267-68.  Although the  record demonstrates that Armijo was qualified, it also  shows

that Perdomo met the minimum qualifications because he had over a year of painting

experience between the cross-training in graffiti removal and four years of building

maintenance experience in the military.  Candelaria testified that Perdomo was not selected

because he was not on the list of qualified applicants.  This determination is inconsistent with

Perdomo's application, which plainly shows at least one year of painting experience.

Perdomo has produced sufficient evidence to show pretext with respect to his non-selection

for the graffiti removal technician position.

With respect to the termination, Perdomo has also submitted evidence of pretext. Gillum excused Perdomo from work until September 29, 2003.  Candelaria testified that she did not receive any paperwork on the police incident injury.  This testimony is suspect because Candelaria ordered an investigation of Perdomo, yet she did not request his treatment records from the City's own health center.  The medical records and work excuses from the employee health center corroborate Perdomo's claim that he was unable to work during September 2003.  Gillum's recommendation that Perdomo should use his arms as much as possible undercuts the significance of the surveillance videos.  Such inconsistencies support a finding of pretext.  *See Kendrick v. Penske Trans. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).  Perdomo has produced sufficient evidence to show pretext with respect to his termination.

From the evidence, considered in the aggregate and construed in the light most favorable to Perdomo, a reasonable jury could conclude that the City's proffered explanation for terminating Perdomo was pretextual.  Perdomo has submitted sufficient evidence to preclude summary judgment on his retaliation claims.


**WHEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Strike Exhibits 1-4 and 6-71 to Plaintiff's Response to Defendant's Motion for Summary Judgment, (Doc. 55), filed on March 29, 2005, is **DENIED** as to Exhibits 1-4, 6-64, and 70-71, and **GRANTED** as to

Exhibits 65-69.

   **IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment

(Doc. 42), filed on February 14, 2005, is **GRANTED** as to the disability discrimination

claims, but **DENIED** as to the retaliation claims.


_____

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**